952 A.2d 266

STATE of Maryland CENTRAL COLLECTION UNIT

v.

Robert William JORDAN.

No. 118, Sept. Term, 2007.

Court of Appeals of Maryland.

July 24, 2008.

Michael Scott Friedman, Asst. Atty. Gen., (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for petitioner

No argument on behalf of appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, and IRMA S. RAKER, (Retired, specially assigned), and DALE R. CATHELL, (Retired, specially assigned), JJ.

BATTAGLIA, J.

In the present case, the Respondent, Robert William Jordan, a resident of Glen Burnie, failed to maintain insurance on a truck registered to him in accordance with Section 17–103 of the Transportation Article, Maryland Code (1988, 2006 Repl. Vol.).[1] When the insurance lapsed, Jordan failed to renew or otherwise surrender evidence of the registration to the Motor Vehicle Administration ("MVA") as required under Section 17–106 and, pursuant to the same Section, the State of Mary-

---

1. All statutory references are to the Transportation Article, Maryland Code (1977, 2006 Repl.Vol.), unless otherwise noted.

land Central Collection Unit[2] ("the State"), the Petitioner, obtained a judgment against Jordan in the District Court of Maryland for Anne Arundel County. Having noted an appeal to the Circuit Court, Jordan testified that he sold the truck for cash before cancelling the insurance and argued that "the vehicle was not being driven with those tags without insurance." The Circuit Court Judge reversed the judgment of the District Court, stating that he found Jordan "to be extremely credible and his testimony compelling," and that he "underst[ood] [that] [Jordan] has these obligations under state law but it seems to me he didn't knowingly fail to do anything, in fact, [he] thought he had done everything he was supposed to do." The State petitioned for certiorari, which we granted, to answer the following question:

> Did the circuit court err as a matter of law in finding that because, as it believed, respondent did not intentionally fail to maintain insurance on his motor vehicle registered in the State of Maryland, the MVA could not impose statutory penalties for his failure to maintain insurance on his motor vehicle?

*Central Collection v. Jordan,* 402 Md. 623, 938 A.2d 825 (2008).[3] We shall reverse the judgment of the Circuit Court and hold that Section 17–106 is a strict liability statute that does not require a showing of knowledge or intent to establish a violation thereof.

---

**2.** In its complaint, the Central Collection Unit was identified as the statutory assignee of the account under Section 3–302 of the State Finance and Procurement Article, Maryland Code (1985, 2006 Repl. Vol.), which states in part:

(a) *General responsibility.*—(1) Except as otherwise provided in subsection (b) of this section or in other law, the Central Collection Unit is responsible for the collection of each delinquent account or other debt that is owed to the State or any of its officials or units. (2) An official or unit of the State government shall refer to the Central Collection Unit each debt for which the Central Collection Unit has collection responsibility under this subsection and may not settle the debt.

**3.** We also granted the State's Motion to Stay Enforcement of Judgment pending our decision.

## I. Introduction

The facts recited in the State's brief were as follows: [4]

It is undisputed that during the period of November 30, 2003 through and including September 30, 2005, MVA official records indicated that Jordan was the registered owner of a 1986 GMC truck that was not covered by the required security, i.e., insurance. Although all registered owners are instructed to surrender license tags to MVA upon cancellation of insurance, MVA records also indicate that evidence of the truck's registration was never surrendered, a fact Jordan and his witness admitted. Nor did Jordan, after being requested to do so, ever respond to MVA's requests for information concerning the insurance cancellation. Instead, he ignored MVA's entreaties.

The State filed suit against Jordan on September 18, 2006, alleging that he "incurred a debt in the amount of $4,630.00 with the Motor Vehicle Administration (MVA) for compulsory insurance violation penalties assessed during the period of November 30, 2003 through September 30, 2005." The complaint further alleged that Jordan owed the State $4,655.00 as well as a 17% collection fee of $791.35, pursuant to Section 3–304 of the State Finance and Procurement Article, Maryland Code (1985, 2006 Repl.Vol.) [5] and COMAR 17.01.01.07 [6] for a total amount due of $5,446.35, for which the State allegedly

---

4. Jordan did not file a brief.

5. Section 3–304 of the State Finance and Procurement Article, Maryland Code (1985, 2006 Repl.Vol.) provides:

 (a) *In general.*—In carrying out its responsibilities, the Central Collection Unit may:

 (1)(i) institute, in its name, any action that is available under State law for collection of a debt or claim; or

 (ii) without suit, settle the debt or claim;

 (2) for all debts or claims collected on or after June 1, 1992:

 (i) in addition to the outstanding principal and interest, assess and collect from the debtor a fee, which may not exceed 20% of the outstanding principal and interest, sufficient to cover all collection and administrative costs; and

 (ii) prior to crediting any amount to any agency which refers a debt for any purpose, withhold a fee sufficient to cover all collection and administrative costs; and

repeatedly made demand. After trial, the District Court judge entered judgment for the total amount, which the Circuit Court reversed.

## II. Discussion

Before us, the State argues that the Circuit Court erred in considering intent as an element of Section 17–106 with respect to failure to maintain insurance, because 17–106 is a strict liability statute. Jordan, not having filed a brief, relies on the ruling of the Circuit Court.

---

(3) waive or reduce any fee assessed under paragraph (2) of this subsection.

(b) *Collection and other costs.*—In addition to the authority provided under subsection (a) of this section, and notwithstanding that the Central Collection Unit is a unit of the State government and that assistant Attorneys General represent the Unit, the Unit may enforce a statutory or written contractual obligation of a debtor to pay costs in addition to principal, including collection costs, counsel fees, or interest penalties.

(c) *Reports to consumer reporting agencies.*—Notwithstanding any other provision of law, the Central Collection Unit may report any account referred to it under this section to a consumer reporting agency.

6. COMAR 17.01.01.07 similarly provides for a collection fee:

A. The Central Collection Unit shall charge the debtor a collection fee of 17 percent on all accounts referred for collections, except on accounts referred to the Unit solely for collection under the tax refund intercept program.

B. For all collections resulting from the Central Collection Unit's efforts:

(1) The Central Collection Unit shall deduct from the proceeds a charge for administrative expenses and additional expenses, such as court costs and witness fees;

(2) The charge for administrative expenses is 17 percent of the total proceeds;

(3) The charge for administrative expenses on accounts referred to the Central Collection Unit solely for collection under the Tax Refund Intercept Program is 10 percent of the total proceeds.

C. The charges in §§ A and B of this regulation may be waived or reduced at the discretion of the Central Collection Unit.

D. On an account forwarded by the Central Collection Unit to an out-of-State attorney or to a commercial collection agency, the fee paid to the attorney or collection agency, plus court costs, witness fees, and other expenses, shall be deducted from any proceeds. Under these circumstances, a fee may not be charged for the Central Collection Unit's efforts.

 The issue presented in this case is simply whether Section 17–106 is a strict liability statute or one requiring proof of knowledge or intent for a violation thereof. Generally, a violation of a penal statute requires proof of intent, which has, "traditionally not been limited to the narrow, dictionary definition of purpose, aim, or design, but instead has often been viewed as encompassing much of what would ordinarily be described as knowledge," while "the modern approach is to define separately the mental states of knowledge and intent," so that intent is now defined as "purpose." Wayne R. La-Fave, *Criminal Law,* Section 5.2(b) (4th ed.2003). A strict liability statute, conversely, "does not require the State to prove *mens rea.*" [7] *Garnett v. State,* 332 Md. 571, 585, 632 A.2d 797, 804 (1993).

In statutory interpretation, our primary goal is always "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Gen. Motors Corp. v. Seay,* 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). *See also Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007). We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Barbre,* 402 Md. at 172, 935 A.2d at 708; *Kelly,* 397 Md. at 420, 918 A.2d at 482. *See also Kane v. Bd. of Appeals of Prince George's County,* 390 Md. 145, 167, 887 A.2d 1060, 1073 (2005). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *Barbre,* 402 Md. at 173, 935 A.2d at 708–09; *Kelly,* 397 Md. at 419, 918 A.2d at 482; *City of Frederick v. Pickett,* 392 Md. 411, 427,

---

7. *Mens rea* has been defined as "the guilty mind or mental state accompanying a forbidden act." *Garnett v. State,* 332 Md. 571, 578, 632 A.2d 797, 800 (1993). *See also* Wayne R. LaFave, *Criminal Law,* Section 5.1 (4th ed.2003) (describing *mens rea* as interchangeable with the terms " 'guilty mind,' " *"scienter"* and "criminal intent").

897 A.2d 228, 237 (2006); *Davis v. Slater*, 383 Md. 599, 604–05, 861 A.2d 78, 81 (2004). If, however, the language is subject to more than one interpretation, or when the terms are ambiguous when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute. *Barbre*, 402 Md. at 173, 935 A.2d at 709; *Kelly*, 397 Md. at 419–20, 918 A.2d at 482; *Smack v. Dep't of Health & Mental Hygiene*, 378 Md. 298, 305, 835 A.2d 1175, 1179 (2003). When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the "purpose, aim, or policy of the enacting body," *Serio v. Baltimore County*, 384 Md. 373, 390, 863 A.2d at 952, 962 (2004); *Drew v. First Guar. Mortgage Corp.*, 379 Md. 318, 327, 842 A.2d 1, 6 (2003), and attempt to harmonize provisions dealing with the same subject so that each may be given effect. *Bowen v. City of Annapolis*, 402 Md. 587, 613–14, 937 A.2d 242, 258 (2007); *Magnetti v. Univ. of Md.*, 402 Md. 548, 565, 937 A.2d 219, 229 (2007); *Clipper Windpower, Inc. v. Sprenger*, 399 Md. 539, 554, 924 A.2d 1160, 1168 (2007).

Title 17 of the Transportation Article, the lynchpin of the present case, provides the statutory framework for the compulsory insurance law. Section 17–104(b) compels drivers to maintain security: "[t]he owner of a motor vehicle that is required to be registered in this State shall maintain the required security for the vehicle during the registration period," the form of which is governed by Section 17–103, which states:

(a) *Required form; annual assessment.*—(1) Except as provided in paragraph (2) of this subsection, the form of security required under this subtitle is a vehicle liability insurance policy written by an insurer authorized to write these policies in this State.

(2) The Administration may accept another form of security in place of a vehicle liability insurance policy if it finds that

the other form of security adequately provides the benefits required by subsection (b) of this section.

(3) The Administration shall, by regulation, assess each self-insurer an annual sum which may not exceed $750, and which shall be used for actuarial studies and audits to determine financial solvency.

(b) *Required minimum benefits.*—The security required under this subtitle shall provide for at least:

(1) The payment of claims for bodily injury or death arising from an accident of up to $20,000 for any one person and up to $40,000 for any two or more persons, in addition to interest and costs;

(2) The payment of claims for property of others damaged or destroyed in an accident of up to $15,000, in addition to interest and costs;

(3) Unless waived, the benefits described under § 19–505 of the Insurance Article as to basic required primary coverage; and

(4) The benefits required under § 19–509 of the Insurance Article as to required additional coverage.

Section 17–106 [8] provides penalties for failing to maintain the required form of insurance on a motor vehicle and states in part:

---

**8.** Section 17–106 was first enacted by Chapter 73 of the Maryland Laws of 1972 and was then codified at Section 7–102 of Article 66½, Maryland Code (1957, 1970 Repl.Vol., 1972 Supp.), which stated:

(a) If at any time, the security required of any person under § 7–101 of this article shall lapse or terminate, the certificate of registration of the motor vehicle for which the security was in effect, shall, as of the date the security lapses or terminates, be automatically suspended, and shall remain suspended until the security is replaced.

(b) Every insurer writing motor vehicle liability insurance in this State, including the Maryland Automobile Insurance Fund, and every provider of other security approved and accepted by the Administrator in lieu of such insurance shall immediately notify the Administrator of the lapse or termination of any such insurance or security issued to or provided for a resident of this State. Upon receipt of any such notice, the Administrator shall make a reasonable effort to notify the person that his certificate of registration has been suspended, and shall attempt to recover the certificate from such person.

(d) *Owner to surrender evidences of registration.*—(1) Within 48 hours after an owner is notified by the Administration of the suspension of registration, the owner shall surrender all evidences of that registration to the Administration.

(2) If the owner fails to surrender the evidences of registration within the 48–hour period, the Administration:

(i) Shall attempt to recover from the owner the evidences of registration; and

(ii) May suspend his license to drive until he returns to the Motor Vehicle Administration the evidences of registration.

(3) The Administration may enter into contracts with private parties to procure the services of independent agents to assist in the recovery of the evidences of registration as authorized in paragraph (2) of this subsection.

---

(c) No suspension of a certificate of registration hereunder shall affect the status of title to the motor vehicle, or any property rights in such motor vehicle; but the provisions of § 3–401 of this article shall be applicable with respect to the operation of such motor vehicle.

In 1977, the Transportation Article was recodified, 1977 Md. Laws, Chap. 14; Section 7–102 was renumbered as Section 17–106 and, for the first time, included monetary penalties for failing to maintain insurance:

(e) *Penalties.*—(1) In addition to any other penalty provided for in the Maryland Vehicle Law, if the required security for a vehicle terminates or otherwise lapses during its registration year, the Administration may assess the owner of the vehicle with a penalty of up to $60 for each vehicle without the required security.

Md.Code (1977), § 17–106(e)(1) of the Transportation Article. In 1983, the Legislature altered certain penalty provisions of the statute after stating in the preamble to the Act that the "enforcement of this State's compulsory insurance laws is important to the well-being and safety of the citizens of this State" and that "the growing number of uninsured motorists in this State is a serious concern." 1983 Md. Laws, Chap. 617. The new language provided:

(e) *Penalties.*—(1) In addition to any other penalty provided for in the Maryland Vehicle Law, if the required security for a vehicle terminates or otherwise lapses during its registration year, the Administration may assess the owner of the vehicle with a penalty of $100 for each vehicle without the required security for a period of 1 to 30 days. If a fine is assessed, beginning on the 31st day the fine shall increase by a rate of $2 for each day.

Md.Code (1977, 1983 Supp.), § 17–106(e)(1) of the Transportation Article.

(e) *Penalties.*—(1)(i) In addition to any other penalty provided for in the Maryland Vehicle Law, if the required security for a vehicle terminates or otherwise lapses during its registration year, the Administration may assess the owner of the vehicle with a penalty of $150 for each vehicle without the required security for a period of 1 to 30 days. If a fine is assessed, beginning on the 31st day the fine shall increase by a rate of $7 for each day.

(ii) Each period during which the required security for a vehicle terminates or otherwise lapses shall constitute a separate violation.

(iii) The penalty imposed under this subsection may not exceed $2,500 for each violation in a 12–month period.[9]

Section 17–107 follows the statute at issue and prohibits driving or allowing others to drive an uninsured vehicle:

(a) *Vehicles not covered by required security.*—A person who knows or has reason to know that a motor vehicle is not covered by the required security may not:

(1) Drive the vehicle; or

(2) If he is an owner of the vehicle, knowingly permit another person to drive it.

(b) *Evidence of violation of subsection (a).*—(1) In any prosecution under subsection (a) of this section the introduction of the official records of the Motor Vehicle Administration showing the absence of a record that the vehicle is covered by the security required under § 17–104 of this subtitle shall be prima facie evidence that a person knows or

---

9. Section 17–104 authorizes the Motor Vehicle Administration to adopt regulations establishing procedures to notify a driver of the penalties under 17–106 for failing to maintain the required insurance:

(c) *Regulations and Procedures.*—The Administration, in consultation with the Maryland Insurance Administration and representatives of the automobile insurance industry, shall adopt regulations that establish procedures to be used by an insurer to provide timely notification to an insured of the penalties that may be imposed in accordance with § 17–106 of this subtitle if the insured fails to renew or replace a policy of motor vehicle liability insurance without surrendering the evidences of registration.

has reason to know that a motor vehicle is not covered by the required security.

(2) The introduction of evidence of the records of the Administration may not limit the introduction of other evidence bearing upon whether the vehicle was covered by the required security.

(c) *Defense of sovereign immunity.*—An owner or lessee of any motor vehicle registered under Title 13 of this article may not raise the defense of sovereign or governmental immunity as described under § 5–524 of the Courts and Judicial Proceedings Article.

■ In the present case, Section 17–106 is silent as to whether knowledge or intent is a required element for a violation thereof. The absence of such language in a statute, however, does not necessarily make it a strict liability offense. *See Staples v. United States,* 511 U.S. 600, 619, 114 S.Ct. 1793, 1804, 128 L.Ed.2d 608, 624 (1994) ("Silence does not suggest that Congress dispensed with *mens rea* for the element of § 5861(d) at issue here."); *Outmezguine v. State,* 335 Md. 20, 42, 641 A.2d 870, 881 (1994) (noting that in certain cases, "the Legislature, despite an omission, intended to provide a *mens rea* requirement").

In *Outmezguine,* 335 Md. at 20, 42, 641 A.2d at 870, we were called upon to determine whether Section 419A (c) of Article 27, Maryland Code (1957, 1992 Repl.Vol.), which penalized photographing or filming a minor engaging in an obscene act or sexual conduct, was a strict liability statute or not. We determined that the statute did not require proof of knowledge or intent for its violation, after we reviewed its plain language, bulwarked by a review of its legislative history. Chief Judge Robert Murphy, writing for the Court, contrasted the Section under scrutiny, Section 419A (c), with Sections 419A (b) and (d) of Article 27, penalizing, respectively, soliciting, causing to induce, or permitting a minor to engage, as the subject, in the production of any obscene matter, and promoting, distributing, or possessing with the intent to distribute any matter depicting a minor engaged, as a subject, in sexual

conduct, which each contained knowingly requirements and concluded that the absence of such a scienter requirement reflected a "purposeful design." *Id.* at 44, 641 A.2d at 882. In support, he reflected upon the statutory Section's legislative history, as explicated by the Court of Special Appeals, and concluded:

It is therefore clear, both from the plain language of § 419A and from the statute's legislative history, that knowledge as to the minor's age is not an element of the offense under § 419A (c). Not so clear is whether the Legislature intended to make this offense a strict liability crime or whether it intended to provide a reasonable mistake of age defense.

*Id.* at 45, 641 A.2d at 882–83. *See also Dawkins v. State*, 313 Md. 638, 651, 547 A.2d 1041, 1047 (1988) (concluding, based partly on the relevant statutory scheme, that knowledge is an element of possession of a controlled dangerous substance and possession of controlled paraphernalia, although not explicitly set forth in the statute); *Garnett*, 332 Md. at 585–88, 632 A.2d at 804–05 (holding that silence as to *mens rea* for statutory rape stood in stark contrast to another crime codified in the same Section, that of having vaginal intercourse with an incapacitated or helpless person, which included a *mens rea* element, and concluding that such an absence, coupled with the drafting history of the statute, reflected an intent on the part of the Legislature to omit a *mens rea* requirement for statutory rape).

Significantly, Section 17–107 relates to the required security on a motor vehicle and explicitly prohibits a person who *knows* or has reason to *know* a motor vehicle is uninsured to drive the vehicle or "*knowingly* permit another person to drive it." (emphasis added). The Legislature chose to include a *mens rea* requirement in Section 17–107, while not providing such a requirement in Section 17–106, even though Section 17–106 was renumbered and revised by the same Bill that enacted Section 17–107. *See* 1977 Maryland Laws, Chapter 14. The Legislature's omission of a *mens rea* requirement in 17–106, therefore, leads us to conclude that the Legislature deliberately chose not to make knowledge an element of the offense of

maintaining the required security on an automobile. *See Outmezguine*, 335 Md. at 45, 641 A.2d at 882–83.

This conclusion is bulwarked by our analyses of other regulatory strict liability offenses in various previous cases. Regulatory strict liability mandates, which are premised on the police power of the State, emerged in both the United States and England in the 19th Century in order to "protect the public health and welfare." [10] *Dawkins*, 313 Md. at 644, 547 A.2d at 1043. In *Morissette v. United States*, 342 U.S. 246, 255–56, 72 S.Ct. 240, 246, 96 L.Ed. 288, 296 (1952), the United States Supreme Court explicated that "[t]hese cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals" and that many of these regulatory strict liability offenses "are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty." In fact, violations of these regulations may "result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize." *Id.* at 256, 72 S.Ct. at 246, 96 L.Ed. at 296. Notably, the Court concluded with respect to regulatory strict liability statutes that, "whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according

---

**10.** Their enactment was in response to the plethora of hazards brought about by the Industrial Revolution:

Traffic of velocities, volumes and varieties unheard of, came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.

*Morissette v. United States*, 342 U.S. 246, 254, 72 S.Ct. 240, 245, 96 L.Ed. 288, 295–96 (1952).

to fortuity. *Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element." Id.* at 256, 72 S.Ct. at 246, 96 L.Ed. at 296–97. (emphasis added). Clearly, 17–106 is a regulatory statute, as defined by its purpose, that being that "enforcement of this State's compulsory insurance laws is important to the well-being and safety of the citizens of this State" and "the growing number of uninsured motorists in this State is a serious concern." 1983 Maryland Laws, Chapter 617.

We also have considered, when determining whether a statute is a strict liability one, in addition to the characteristic of being regulatory in nature, what type of penalty provision is included and whether the defendant is "generally in a position to prevent the violation from occurring," regardless of his or her state of mind. *State v. McCallum,* 321 Md. 451, 457, 583 A.2d 250, 253 (1991). *See also Owens v. State,* 352 Md. 663, 678, 724 A.2d 43, 50 (1999) ("[C]ourts have considered the substantiality of the penalty imposed by a statute in determining whether a statute includes a mens rea element....."). In evaluating the penalty provision set forth for violation of the compulsory insurance law, we note that only a monetary fine is a sanction, not incarceration. *See McCallum,* 321 Md. at 457, 583 A.2d at 253 (stating that the possibility of incarceration for violating a statute suggests that the legislature intended it to have a *mens rea* requirement); *Dawkins,* 313 Md. at 651, 547 A.2d at 1047 (evaluating the penalty, which includes up to four years in prison, a $25,000 fine or both and concluding, based partly on the nature of the penalty, that the offense was not a strict liability crime). *See also Staples,* 511 U.S. at 618–19, 114 S.Ct. at 1804, 128 L.Ed.2d at 624 (noting that "a severe penalty is a ... factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement").

The statutory penalty in the present case consists of a $150.00 fee for a vehicle registered without the required security for a period of 1 to 30 days and $7.00 per day thereafter. Section 17–106(e)(1)(i). Significantly, the statute provides that the sanction "may not exceed $2,500 for each

violation in a 12–month period." *Id.* at (e)(1)(iii). Providing for such a cap and a daily fee to encourage compliance is consistent with the goal of regulatory strict liability statutes, which is to "regulate rather than to punish behavior." *See Dawkins,* 313 Md. at 645, 547 A.2d at 1044, citing *People v. Vogel,* 46 Cal.2d 798, 299 P.2d 850, 853 n. 2 (1956).

Whether " 'the defendant is generally in a position to prevent the violation from occurring' " is a third consideration in the determination of whether a statute engenders strict liability characteristics. *McCallum,* 321 Md. at 457, 583 A.2d at 253, quoting *Dawkins,* 313 Md. at 645, 547 A.2d at 1044. In *McCallum,* the defendant contended, as a defense to the charge of driving on a suspended license, that he had no notice of the suspension of his license. We iterated, in concluding that the statute was not a strict liability offense, that the defendant "would have no reason to avoid driving and no reason to suspect that he was endangering the public by driving if he had no knowledge that his driving privileges were suspended." *Id.* Conversely, in the present case, Jordan had the ability both to prevent the violation from occurring as well as recurring on a daily basis.

Upon a consideration of the larger statutory context in which Section 17–106 appears, as well as the Section's regulatory purpose, the extent of the penalty involved and whether its violator is generally in a position to prevent the offense, it is evident that Section 17–106 is a strict liability statute that does not require a showing of knowledge or intent for a violation thereof.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; STAY REMOVED; CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE DISTRICT COURT; COSTS TO BE PAID BY APPELLEE.**